UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CLAUDIA L. COOK,                    :
                                    :
          Plaintiff                 :      CIVIL NO. 4:11-CV-00547
                                    :
     vs.                            :      (Judge Conaboy)
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
          Defendant                 :

MEMORANDUM

BACKGROUND

          The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Claudia L. Cook's claim for social security
disability insurance benefits.

          Cook filed her application for disability insurance
benefits on September 30, 2008. Tr. 9, 59, 159-166 and 182.[1]  The
application was initially denied by the Bureau of Disability
Determination on March 5, 2009. Tr. 9 and 76-79.[2]  On March 31,
2009, Cook requested an administrative hearing. Tr. 9 and 80-81.
After about 12 months had passed, a hearing was held on March 18,

---

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on May 27,
2011.

2.  The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits on behalf of the
Social Security Administration.  Tr. 76.

2010. Tr. 19-58.  On June 4, 2010, the administrative law judge issued a decision denying Cook's application. Tr. 9-18.  Cook filed a request for review with the Appeals Council and on January 20, 2011, the Appeals Council concluded that there was no basis upon which to grant Cook's request for review. Tr. 1-5 and 153. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.  Cook then filed a complaint in this court on March 23, 2011.  Supporting and opposing briefs were submitted and the appeal[3] became ripe for disposition on August 8, 2011,  when Cook filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Cook meets the insured status requirements of the Social Security Act through December 31, 2012. Tr. 9, 168, 175 and 182.

Cook, who was born in the United States on January 29, 1961,  graduated from high school in 1978 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 59, 159, 168, 175, 182, 185, 192 and

───────────────

3.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

208.   After high school Cook served in the United States Army from November 11, 1981 to August 27, 1984, during which time she received clerical training.  Tr. 160, 176 and 192.

Records of the Social Security Administration reveal that Cook had reported earnings in 1977 through 2008 as follows: in 1977 $289,56, 1978 $686.15, 1979 $3459.15, 1980 $4466.26, 1981 $3382.38, 1983 $9275.25, 1984 $7748.31, 1985 $8671.38, 1986 $9459.67, 1987 $11,543.72, 1988 $2495.90, 1989 $1056.00, 1990 $2508.00, 1991 $4623.04, 1992 $11,951.26, 1993 $9981.53, 1994 $17,602.15, 1995 $16,780.89, 1996 $20,470.12, 1997 $21,853.65, 1998 $24,045.26, 1999 $22,090.44, 2000 $25,192.65, 2001 $26,745.00, 2002 $28,252.50, 2003 $29,419.65, 2004 $31,213.80, 2005 $31,577.94, 2006 $36,900.32, 2007 $12,731.92 and 2008 $65.55. Tr. 176.  Cook's total earnings during those years were $444,970.80. Id.  Cook has no reported earnings after 2008. Id.

Cook's past relevant employment[4] was as a clerk/typist/purchasing agent for the Pennsylvania Bureau of Workers' Compensation from 1993 through 2006; and as a general clerk and customer service person from October, 2006 through February 2, 2008.  Tr. 32-33, 171-173, 187 and 241.  The clerk/typist/

---

4.  Past relevant employment in the present case means work performed by Cook during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

purchasing agent position was described by a vocational expert as skilled, sedentary work; the general clerk position as semi-skilled, light work; and the customer service position also as semi-skilled, light work.[5]  Tr. 32-33.  All of the positions were described as requiring frequent use of the hands.  Id.  Cook's last employment was as a customer service person for Kohl's Department Store. Tr. 167 and 241.

_____

5.  The terms sedentary and light work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

4

Cook claims that she became disabled on February 2, 2008, because of psoriatic arthritis[6] and fibromyalgia.[7]

---

6.   "Psoriatic arthritis is a type of arthritis that often occurs with psoriasis of the skin. . . Psoriasis is a common, chronic skin condition that causes red patches on the body.  About 1 in 20 people with psoriasis will develop arthritis . . . The arthritis may be mild and involve only a few joints, particularly those at the end of the fingers or toes. In some people the disease may be severe and affect many joints, including the spine. When the spine is affected, the symptoms are stiffness, burning and pain, most often in the lower spine and sacrum." Psoriatic arthritis, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.ncbi.nlm. nih.gov/pubmedhealth/PMH0001450/ (Last accessed April 5, 2012).

7.   Fibromyalgia is described by the American College of Rheumatology in pertinent part as follows:

Fibromyalgia is an often misunderstood – even unrecognized – disorder that causes widespread muscle pain and tenderness which tends to come and go, and move about the body.  This common and chronic condition also can be associated with fatigue and sleep disturbances.

Fast facts

● Fibromyalgia affects 2-4% of the population, predominantly women.

● Fibromyalgia is diagnosed based on patient symptoms and physical examination. There is no laboratory, radiographic, or other diagnostic test, but these can be used to exclude other conditions.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

What is fibromyalgia?

Fibromyalgia is defined by chronic widespread muscular pain and symptoms such as fatigue, sleep disturbance, stiffness, cognitive and memory problems, and symptoms of depression and anxiety. More localized pain

(continued...)

———————————————

7.  (...continued)
         conditions often occur in patients with fibromyalgia,
         including migraine or tension headaches,
         temporomandibular disorder, irritable bowel syndrome,
         gastroesophageal reflux disorder, irritable bladder,
         and pelvic pain syndrome. The symptoms of fibromyalgia
         and associated conditions can vary in intensity and
         wax and wane over time. Stress often worsens these
         symptoms.

         *    *    *    *    *    *    *    *    *    *    *

American College of Rheumatology, Practice Management,
Fibromyalgia, http://www.rheumatology.org/practice/clinical/
patients/diseases_and_conditions/fibromyalgia.asp (Last accessed
April 5, 2012). Also, "it is often the rheumatologist who makes
the diagnosis (and rules out other rheumatic diseases), but [the]
primary care physician can provide all the care and treatment for
fibromyalgia . . . ." Id.

         The Mayo Clinic website sets forth the criteria for
diagnosing fibromyalgia as follows:

         Tests and diagnosis

         In 1990, the American College of Rheumatology (ACR)
         established two criteria for the diagnosis of
         fibromyalgia:

              ■ Widespread pain lasting at least 3 months

              ■ At least 11 positive tender points–out of a total
                possible of 18

         But fibromyalgia symptoms can come and go.  And many
         doctors were uncertain about how much pressure to apply
         during a tender point exam. While the 1990 guidelines
         may still be used by researchers studying fibromyalgia,
         less stringent guidelines have been developed for
         doctors to use in general practice.  These newer
         diagnostic criteria include:

              ■ Widespread pain lasting at least three months

              ■ No other underlying condition that might be
                                        (continued...)

6

Tr. 76 and 186.  Cook contends that she cannot lift more than 3
pounds; that it takes her one to two hours to get around in the
morning; that she cannot do writing, typing, cooking, cleaning, or
anything requiring the use of the hands other than for a couple
minutes at a time; that she has trouble concentrating because of
the medications she takes; that she cannot stand or sit in the
same position for long periods; that she takes Prozac to help with
her energy and depression; that she is fatigued and tired most of
the day; that her hands, hips, neck and shoulders are the most
painful areas; that she had psoriatic arthritis since 1998 and it
has worsened over the years; that she has constant pain and is on
medications to control the inflammation and pain; that she has
difficulty sleeping; that her medical conditions result in
limitations in lifting, squatting, bending, standing, reaching,
walking, kneeling, stair climbing, seeing, memory, completing
tasks, concentration, and using her hands; and because of her
impairments she cannot engage in any type of work, including

---

7.  (...continued)
            causing the pain

Fibromyalgia, Tests and diagnosis, Mayo Clinic staff,
http://www.mayoclinic.com/health/fibromyalgia/DS00079/DSECTION=te
sts-and-diagnosis (Last accessed April 5, 2012).

sedentary work.[8] Tr. 14, 186, 193 and 210.  Cook has not worked since February 2, 2008.[9] Tr. 186.

For the reasons set forth below we will affirm the decision of the Commissioner denying Cook disability insurance benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,

---

8.  As will be mentioned in detail infra her treating rheumatologist rejected many of this alleged limitations.

9.  Cook was 47 years of age on her alleged disability onset date and considered a "younger individual" under the Social Security regulations. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  Younger individuals can more readily adjust to other work. Id.

38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work

10

which exists in the national economy, regardless of
whether such work exists in the immediate area in which
he lives, or whether a specific job vacancy exists for
him, or whether he would be hired if he applied for
work.  For purposes of the preceding sentence (with
respect to any individual), "work which exists in the
national economy" means work which exists in significant
numbers either in the region where such individual
lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating claims for disability insurance benefits.  See 20
C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process
requires the Commissioner to consider, in sequence, whether a
claimant (1) is engaging in substantial gainful activity,[10] (2)
has an impairment that is severe or a combination of impairments
that is severe,[11] (3) has an impairment or combination of
impairments that meets or equals the requirements of a listed

---

10.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further.

11.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no
impairment or combination of impairments which significantly
limits the claimant's physical or mental abilities to perform
basic work activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.  If a claimant has any
severe impairments, the evaluation process continues.  20 C.F.R.
§ 404.1520(d)-(g). Furthermore, all medically determinable
impairments, severe and non-severe, are considered in the
subsequent steps of the sequential evaluation process.  20 C.F.R.
§§ 404.1523 and 404.1545(a)(2).

11

impairment,[12] (4) has the residual functional capacity to return
to his or her past work and (5) if not, whether he or she can
perform other work in the national economy. Id.  As part of step
four the administrative law judge must determine the claimant's
residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis. See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A
regular and continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or other
similar schedule.  The residual functional capacity assessment
must include a discussion of the individual's abilities.  Id; 20
C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual

_____

12.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience."  Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

13.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Cook's medical records.  Cook primarily received medical care for her alleged impairments from Kevin R. Clawson, D.O.

Cook first sought care from Dr. Clawson on March 21, 2007. Tr. 265.  Dr. Clawson's notes are extremely difficult to decipher because of his poor penmanship.  We can discern that on March 21, 2007, Cook's physical examination findings were essentially normal other than psoriasis and arthritic symptoms. Tr. 266.  The symptoms, however, were noted to be slight to moderate in degree. Id.  Cook had psoriasis of the scalp.  Id.

Dr. Clawson's examination of Cook's cervical spine and shoulders revealed slight decrease in range of motion and slight tenderness[14]; examination of Cook's lumbar spine revealed slight decreased in range of motion and moderate tenderness; examination of Cook's right wrist revealed slight swelling, slight decrease in

---

14.  Dr. Clawson used the following abbreviations: S for Swelling; T for tenderness; L for range of motion; 0 for within normal limits; 1 for slight; 2 for moderate; 3 for marked; w for wrist; e for elbow; s for shoulder; h for hip; k for knee and A for ankle. Tr. 266.

range of motion and slight tenderness; examination of Cook's knees revealed moderate swelling, slight tenderness and slight decrease in range of motion; examination of Cook's ankles revealed slight swelling and tenderness; and examination of Cook's left hand revealed slight swelling and tenderness.  Id.   All the other joints were noted to be "ok." Id.  Dr. Clawson also noted that a straight leg raise test was negative and without radiculopathy. Id.

Dr. Clawson's assessment was that Cook suffered from "scalp psoriasis [and] spondyloarthropathy[15] [with] active polyarthritis."[16] Id.   Dr. Clawson ordered blood work and

_____

15.  Spondyloarthropathy is defined as "disease of the joints of the spine." Dorland's Illustrated Medical Dictionary, 1567 (27th Ed. 1988).

16.  Polyarthritis is defined as "an inflammation of several joints together." Dorland's Illustrated Medical Dictionary, 1329 (27th Ed. 1988).

14

prescribed the medications Enbrel,[17] Salsalate[18] and the narcotic

pain medication Ultracet. Id.

  At an appointment with Dr. Clawson on May 23, 2007, Cook

reported that she was "overall better." Tr. 264.  Dr. Clawson

noted that the laboratory work had "[a]ll returned [within normal

limits] or [stable]."[19]  Id.  The results of a physical

---

17.  "Enbrel is used to treat the symptoms of rheumatoid
arthritis, psoriatic arthritis, or ankylosing spondylitis, and to
prevent joint damage caused by these conditions." Enbrel,
Drugs.com, http://www.drugs.com/enbrel.html (Last accessed April
5, 2012).

18.  "Salsalate is a non-steroidal anti-inflammatory drug (NSAID)
. . . . Salsalate is used to reduce pain, swelling, and joint
stiffness caused by arthritis." Salsalate, Drugs.com, http://www.
drugs.com/mtm/salsalate.html (Last accessed April 5, 2012). Along
with aspirin, Salsalate is in a group of drugs referred to as
salicylates. Id.

19.  Of the items that we can decipher, the record indicates that
Dr. Clawson ordered a complete blood count, erthrocyte
sedimedation rate (ESR), creatinine test, liver function tests,
and thyroid stimulating hormone tests.  The ESR is a test for the
presence of an inflammatory process. Tr. 266. The ESR test
measures the distance red blood cells fall in a test tube in one
hour. The distance indirectly measures the level of inflammation.
The further the red blood cells have descended, the greater
the inflammatory response of your immune system.  The results are
reported in the distance in millimeters the red blood cells have
descended in one hour. The upper threshold for a normal sed rate
value may vary somewhat from one medical practice to another.
However, generally for women the normal result is 29 mm/hr or
below. Sed rate (erthrocyte sedimentation rate), Results, Mayo
Clinic staff, http://www.mayoclinic.com/health/sed-rate/
MY00343/DSECTION=results (Last accessed April 5, 2012). There is
literature which indicates that the normal sed rate is 20 or
below.  Cook had a sed rate of 24 on March 21, 2007; 12 on March
12, 2008; 14 on July 14, 2008; 17 on December 3, 2008; 15 on

(continued...)

examination were essentially normal. Id.  Dr. Clawson noted "less psoriasis" and categorized it as "mild scalp psoriasis." Id.   Dr. Clawson indicated with respect to the cervical and lumbar spine there was slightly diminished range of motion and tenderness.[20] Dr. Clawson noted some slightly decreased range of motion of the left shoulder and slight tenderness; the knees revealed moderate swelling, tenderness and decreased range of motion; the ankles were "better"; the left hand had some moderate swelling and tenderness; and the "other joints" were "ok." Id.

Dr. Clawson's assessment was that Cook suffered from psoriatic arthritis/spondyloarthropathy. Id.  He further noted that Cook was "generally better, but still ha[d] scalp psoriasis [and] active arthritis." Id.  Dr. Clawson added the drug

---

19.  (...continued)
April 22, 2009; 21 on July 14, 2009; 15 on November 4, 2009; and 19 on March 24, 2010. Tr. 333 and 332. The record does not reveal that Cook ever had a blood test for rheumatoid arthritis, i.e., that is the rheumatoid factor (RF).  It also does not reveal that Cook ever had an antinuclear antibodies blood test which is a test that can detect the presence generally of an autoimmune disorder.  A positive ANA test would indicate "that your immune system has launched a misdirected attack on your own tissue." ANA Test, Definition, Mayo Clinic staff, http://www.mayoclinic.com/ health/ana-test/MY00787 (Last accessed April 5, 2012).

20.  With respect to tenderness we are giving Cook the benefit of the doubt because Dr. Clawson's note could be interpreted as a zero for tenderness representing within normal limits instead of a 1 representing slight. Tr. 264.

16

Azulfidine[21] and increased the dosages of Salsalate and Ultracet.
Id.

     At an appointment with Dr. Clawson on August 15, 2007,
Cook was found to have slight swelling in the left ankle but no
tenderness or decreased range of motion; slight decreased range of
motion, slight swelling and no tenderness in the right wrist;
and slightly diminished range of motion, slight swelling and
slight tenderness in the lumbar spine. Tr. 263. Dr. Clawson's
assessment was that Cook suffered from an active rash and
arthritis and he increased the dosage of Azulfidine and Salsalate.
Id. His diagnosis was psoriatic arthritis/spondyloarthropathy.
Id.

     At an appointment with Dr. Clawson on December 13, 2007,
Cook complained of gastrointestinal problems, i.e., nausea and
diarrhea; chronic joint pain; and mild low back pain. Tr. 262. An
examination revealed only slight to moderate symptoms with respect
to Cook's cervical spine, right hip, right wrist, knees and left
elbow. Id. All other joints were found to be within normal
limits. Id. Dr. Clawson's assessment was that Cook suffered from
chronic low level psoriasis and chronic inflammatory arthropathy.
Id. His diagnosis was psoriatic arthritis/spondyloarthropathy.

---

21. Azulfidine is a salicylate anti-inflammatory drug.
Azulfidine, Drugs.com, http://www.drugs.com/cdi/azulfidine.html
(Last accessed April 5, 2012).

Id.  Dr. Clawson discontinued Salsalate because of the gastrointestinal problems and added the narcotic pain medicine Darvocet. Id.

After the alleged disability onset date of February 2, 2008, Cook's first appointment with Dr. Clawson was on March 12, 2008, at which time Cook reported "doing better." Tr. 261.  There were only slight symptoms reported with respect to the right shoulder and wrist and moderate with respect to the knees. Id. All other joints were "ok". Id.  Dr. Clawson's assessment was that Cook was "generally better" with "mild [arthritis]" of the right shoulder and wrist. Id.  His diagnosis was psoriatic arthritis/spondyloarthropathy. Id.  Dr. Clawson continued Cook's medications as prescribed. Id.

Cook had appointments with Dr. Clawson on May 12, July 14, September 22, and December 3, 2008; January 14 and March 25, 2009; and March 24, 2010. Tr. 257-260, 290-291 and 335.  At all of those appointments Dr. Clawson noted slight to moderate symptoms when he examined Clawson's joints. Id.  Also, at each appointment Dr. Clawson assessment included psoriatic arthritis/ spondyloarthropathy.  At the appointment on May 12th Dr. Clawson added a second diagnosis: low back pain/myofascial pain. Tr. 260.

There was a negative straight leg raise test[22] noted at the May 12th appointment. Id.   On December 3, 2008, Dr. Clawson for the first time diagnosed Cook as suffering from fibromyalgia. Tr. 257. Dr. Clawson's treatment notes consistently indicated that Cook had coordination, muscle tone and sensation within normal limits. Tr. 257-61, 285, 290-91.   Dr. Clawson as noted occasionally adjusted Cook's medications but otherwise instructed her to continue medication as prescribed and return every 2 to 2.5 months. Id.

An x-ray of Cook's right wrist on July 14, 2008, revealed "[m]ild periarticular osteopenia, without erosive changes or acute osseous abnormality." Tr. 253.   An x-ray of the lumbar spine on the same day revealed mild degenerative disc disease of the lumbar spine and mild L4-L5 facet arthropathy.[23]   Tr. 254.

---

22.   The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.   The patient, either lying or sitting with the knee straight, has his or her leg lifted.   The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed April 5, 2012).

23.   "The facet joints connect the posterior elements of the [vertebrae] to one another. Like the bones that form other joints in the human body, such as the hip, knee or elbow, the articular surfaces of the facet joints are covered by a layer of smooth cartilage, surrounded by a strong capsule of ligaments, and lubricated by synovial fluid. Just like the hip and the knee, the facet joints can also become arthritic and painful, and they can be a source of back pain.   The pain and discomfort that is caused

(continued...)

On February 10, 2009, Ronald Vandegriff, D.O., examined Cook on behalf of the Bureau of Disability Determination. Tr. 268-276.  Dr. Vandegriff observed that Cook's wrist and hand ranges of motion were essentially within normal limits. Tr. 270-271.  Cook admitted that she had a license to drive and could obtain her own groceries. Tr. 272-273.  Dr. Vandegriff observed that Cook had normal station and gait, was able to perform fine and dextrous movements, and was able to get on and off the examination table without difficulty or assistance. Tr. 274-275.  Dr. Vandegriff concluded that Cook was able to lift and carry up to 10 pounds occasionally; stand and walk 4 hours in an 8-hour day, and sit for an unlimited amount of time.[24] Tr. 268.  Dr. Vandegriff concluded that Cook could push and pull hand and foot controls in accordance with her lifting and carrying limitations. Id.  Dr. Vandegriff further found that Cook could occasionally bend and kneel but never stoop, crouch, balance or climb. Tr. 269.  He also found

---

23.  (...continued)
by degeneration and arthritis of this part of the spine is called facet arthropathy, which simply means a disease or abnormality of the facet joints." Facet Arthropathy, Back.com, http://www. back.com/causes-mechanical-facet.html (Last accessed April 5, 2012). The facet joints are in the back of the spine and act like hinges, There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes.

24.  This assessment is consistent with the ability to perform sedentary work.

that she had no reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling or continence limitations. Id. With respect to environmental limitation Dr. Vandegriff concluded that Cook should avoid heights. Id.

On February 25, 2009, Cook had an appointment with Douglas Bower, M.D., for the first time. Tr. 317.  At that appointment Cook denied fatigue, gait disturbance, psychiatric symptoms and weakness. Tr. 317.  She did complain about back pain and multiple joint aches and pains. Id.  The results of a physical examination were essentially normal. Tr. 318-319.  Dr. Bower encouraged Cook to engage in physical activity as tolerated and to take non-steroidal anti-inflammatory medication and muscle relaxers for her arthritic complaints. Tr. 319.  At an appointment on March 23, 2009, Dr. Bower noted that Cook had been stable since her last visit. Tr. 311.  Cook denied fatigue and weakness. Tr. 312.  Cook complained of neck stiffness; shoulder and girdle pain and stiffness; and multiple joint symptoms. Tr. 312.  The results of a physical and mental status examination were essentially normal Tr. 313-314.  Dr. Bower did not observe any gait disturbance, weakness or skeletal tenderness, and instructed Cook to continue her current treatment regimen. Tr. 314.  Six months later, in September 2009, Cook at a third appointment with Dr. Bower stated that she had "done well" since her last appointment.

Tr. 307.  Cook denied fatigue, weakness, gait disturbance and
psychiatric symptoms. Tr. 307-308.  Dr. Bower again observed no
weakness or gait disturbance.  The results of a physical and
mental status examination were essentially normal. Tr. 308-309.
Dr. Bower stated that Cook's psoriatic arthritis was stable. Tr.
309.

On January 18, 2010, Dr. Clawson completed a document
entitled "Medical Source Statement of Ability to Do Work-Related
Activities (Physical)."  Tr. 325-331.  In that document Dr.
Clawson indicated that Cook could only sit, stand and walk a total
of 6 hours in an 8-hour workday thus limiting Cook to less than
the requirements of full-time work. Tr. 326.  Dr. Clawson did
state that Cook could frequently lift and/or carry 10 pounds and
occasionally lift and/or carry 20 pounds. Tr. 325.  He further
stated that Cook could use both her hands for reaching, handling,
fingering, feeling and pushing/pulling on a frequent basis; that
Cook could frequently use both feet to operate foot controls; that
Cook could occasionally climb stairs and ramps and stoop but never
climb ladders or scaffolds, balance, kneel, crouch or crawl. Tr.
328-329.  Dr. Clawson found that Cook had no hearing or vision
limitations and no environmental limitations. Tr. 329-330.  He
further stated that she could perform the following activities:
shopping, travel without a companion, ambulate without an
assistive device, walk a block at a reasonable pace on rough or

22

uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of single hand rail, prepare simple meals and feed herself, care for her personal hygiene, and sort, handle, and use paper/files. Tr. 331.  Other than the sitting, standing and walking limitations, Dr. Clawson assessment is consistent with at least the requirements of sedentary work, if not a limited range of light work.  Dr. Clawson in his assessment did note that he did not perform "[a] formal physical [functional] assessment" and his assessment was a "recommendation based on clinical evaluation." Tr. 325.  The last time that Dr. Clawson examined Cook prior to completing the January 18, 2010, written assessment was March 25, 2009.

At the administrative hearing held in this case on March 18, 2010, Irving Kushner, M.D., testified that based on his review of the objective medical evidence Cook was receiving proper medications for her psoriatic arthritis and that those medications were working. Tr. 26-27.  Dr. Kushner stated that the documentation for fibromyalgia and chronic fatigue preventing Cook from engaging in work was lacking from record. Tr. 30.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Cook had not engaged in substantial gainful work activity since February 2, 2008, the alleged disability onset date. Tr. 11.

23

At step two of the sequential evaluation process, the administrative law judge found that Cook had the following severe impairments: fibromyalgia, psoriatic arthritis, and chronic pain syndrome. Id.  The administrative law judge found that Cook's alleged depression was a non-severe impairment. Id.

At step three of the sequential evaluation process the administrative law judge found that Cook's impairments did not individually or in combination meet or equal a listed impairment. Tr. 12.

At step four of the sequential evaluation process the administrative law judge found that Cook could not perform her prior relevant work but that she had the residual functional capacity to perform a limited range of unskilled, sedentary work. Tr. 13.  Specifically, the administrative law judge found that Cook could perform unskilled, sedentary work which involved only occasional use of the hands. Tr. 12 and 17.  In concluding that Cook had the residual functional capacity to engage in a limited range of sedentary work, the administrative law judge relied, *inter alia*, on the opinion of Dr. Vandegriff, the state agency physician who examined Cook, and Dr. Kushner who testified at the administrative hearing.  Tr. 16-17. The administrative law judge rejected the opinion of Dr. Clawson who opined that Cook was limited to less than full-time work. Id.  In rejecting Dr. Clawson

24

opinion the administrative law judge after referring to the
opinions of Dr. Vandegriff and Dr. Kushner stated as follows:

> The undersigned has accorded limited weight to the
> January 18, 2010 assessment of Kevin R. Clawson, D.O.,
> the claimant's treating rheumatologist, essentially
> finding the claimant capable of only part-time
> sedentary to light work activity, as he limited the
> claimant to sitting 2 hours per 8-hour workday,
> standing 2 hours per 8-hour workday, and walking
> 2 hours per 8-hour workday . . . as there is no
> basis in the record for such a restrictive
> assessment in light of the relatively benign clinical
> and laboratory findings . . . .

Id.

At step five, the administrative law judge based on a
residual functional capacity of a limited range of sedentary work
as described above and the testimony of a vocational expert found
that Cook had the ability to perform unskilled work as a
surveillance system monitor, and that there were a significant
number of such jobs in the national, state and local economies.
Tr. 18.

The administrative record in this case is 335 pages in
length and we have thoroughly reviewed that record.  The
administrative law judge did an adequate job of reviewing Cook's
vocational history and medical records in her decision. Tr. 9-18.
Furthermore, the brief submitted by the Commissioner sufficiently
reviews the medical and vocational evidence in this case. Doc. 10,
Brief of Defendant.

25

Cook argues that the administrative law judge erred in evaluating and weighing the medical evidence, including Dr. Clawson's opinion and that he misrepresented the opinion of Dr. Kushner.  Cook further argues that the administrative law judge failed to adequately assess Cook's credibility.  We find no merit in Cook's arguments.

Although Dr. Clawson, a treating physician, provided a functional assessment limiting Cook to 6 hours per 8-hour workday, Dr. Clawson admitted that his assessment was not based on a formal physical functional assessment.  Also, the assessment was completed by Dr. Clawson almost 10 months after he last examined Cook.  Furthermore, we discern nothing in Dr. Clawson's treatment notes(which generally indicate slight or moderate arthritic symptom) that would prevent Cook from engaging in 2 extra hours of work per 8-hour workday.

The administrative law judge's residual functional capacity assessment is clearly supported by the medical records, the opinion of Dr. Vandegriff and the testimony of Dr. Kushner.

The administrative law judge's reliance on the opinion of Dr. Vandegriff and testimony of Dr. Kushner was appropriate. See Chandler v. Commissioner of Soc. Sec., __F.3d.__, 2011 WL 6062067 at *4 (3d Cir. Dec. 7. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we

readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The administrative law judge appropriately took into account Cook's physical and mental limitations in the residual functional capacity assessment.  The administrative law judge limited Cook to unskilled, sedentary work which did not involve the repetitive or frequent use of her hands.  The vocational expert identified jobs that met those requirements and the administrative law judge appropriately accepted the vocational expert's testimony.

The administrative law judge stated that Cook's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled sedentary work. Tr. 15.  The administrative law judge was not required to accept Cook's subjective claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the

27

administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  <u>Walters v. Commissioner of Social Sec.</u>, 127 f.3d 525, 531 (6th Cir. 1997); <u>see also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed Cook when she testified at the hearing on  March 18, 2010, the administrative law judge is the one best suited to assess the credibility of Cook.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


<u>S/Richard P. Conaboy</u>
RICHARD P. CONABOY
United States District Judge

Dated: April 10, 2012

28